## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CONVERGEONE, INC.,

      Plaintiff,

      v.

LOGICALIS, INC., et al.,

      Defendants.

Case No. 2:22-cv-02151-HLT-ADM

## MEMORANDUM AND ORDER

Plaintiff ConvergeOne, Inc. ("C1") sued four former employees, Defendants Ben Hudson, Lucas Smith, Mark Smalley, and David Heinen, and their new employer Defendant Logicalis, Inc. C1 asserts several claims including breach of contract and tortious interference with contract. The claims arise out of the non-competition agreements the individuals had with C1 and their subsequent employment with Logicalis. C1 seeks a preliminary injunction against Hudson, Smith, Smalley, and Logicalis. Doc. 35.[1] Because C1 has shown a likelihood of success on the merits and irreparable harm, the Court grants C1's motion and issues the following preliminary injunctions:

1.  Defendants Hudson, Smith, and Smalley are enjoined from engaging in the same or substantially similar services or job duties for Logicalis that they performed during the last twelve months of their employment with C1 in the same geographic territory that they were responsible for at C1 for one year from their date of termination.

2.  Defendant Logicalis is enjoined from employing Hudson, Smith, and Smalley in the same or substantially similar services or job duties that they performed during the last

---

[1]  Heinen was added as a party after the preliminary-injunction motion was fully briefed and is not subject to the motion.

twelve months of their employment with C1 in the same geographic territory that they were responsible for at C1 for one year from their date of termination.

All other requested injunctive relief is denied because it is either subsumed within this injunctive language or is otherwise not supported.

## I.     BACKGROUND[2]

### A.     C1 and Logicalis

C1 is an IT consulting company. It focuses on "providing collaboration and technology solutions related to enterprise networking, data center, cloud, and IT security to its customers." Doc. 39 at 3. Alexander Open Systems, Inc. ("AOS") is an "IT consulting group that specializes in architecting, implementing and supporting an expansive portfolio of business solutions, including cloud, collaboration, data center, networking, security, visualization, business intelligence and more." Doc. 53 at 2. C1 acquired AOS in 2017. *Id.* at 9.

Logicalis is an international IT solutions provider "that specializes in recommending, planning, and implementing digital transformation strategies to their clients, including cloud, collaboration, data center, networking, security, and more." *Id.* at 12. C1 and Logicalis are direct competitors. *Id.*; Doc. 50-12 at 35. C1's locations in Overland Park, Topeka, and Wichita are within 150 miles of Logicalis's locations in the Kansas City metro area and Wichita. Doc. 53 at 12.

In January 2020, C1's Executive Vice President for the Eastern Region, Jonathan Groves, left C1 to go to work as the CEO of Logicalis. Doc. 50-15 at 2. Groves had been CEO of AOS before C1's acquisition. *Id.*

---

[2]     The following facts are alleged in the amended verified complaint, the exhibits to the amended verified complaint, and the exhibits submitted with the preliminary-injunction briefing. This includes limited preliminary discovery conducted by the parties, including deposition testimony. The Court has also considered the arguments and additional exhibits presented at the July 7, 2022 preliminary-injunction hearing.

In early 2020, C1's Area Sales Leader in the Kansas City area, Matt Cussigh, also left C1. Cussigh initially went to work for SKC Communications Products. *Id.* at 3. SKC and C1 are not direct competitors. *Id.* Cussigh had a non-competition agreement, but Cussigh's work at SKC did not violate the agreement. *Id.* Cussigh went to work for Logicalis in early 2022. *See* Doc. 44-3 at 4-5.

In January 2021, C1 Account Manager, Megan Rains, also left C1 to work for Cisco. Doc. 50-15 at 3. Cisco is not considered C1's direct competitor. *Id.* Rains then went to work for Logicalis after her one-year non-competition obligations to C1 expired. *Id.*

**B.     Ben Hudson**

AOS hired Hudson on July 23, 2010, as an Account Manager. Doc. 50-2 at 4. As part of his employment with AOS, Hudson signed a Non-Competition and Non-Solicitation Agreement. Doc. 50-10. This agreement had several provisions. Relevant here, these provisions prevented Hudson from:

> Directly or indirectly, voluntarily or involuntarily, actively or silently, under contract or otherwise, whether or not for compensation, and whether as an employee, owner, independent contractor, partner, member, manager, agent, stockholder, director or otherwise, either in conjunction with others or on the Employee's own account anywhere in the United States (i) induce or attempt to induce any customer or supplier of AOS to terminate its relationship with AOS; (ii) otherwise interfere with or disrupt AOS's relationship with its customers and suppliers; (iii) solicit, divert or take away business from AOS as to any customer or supplier; (iv) solicit, divert or take as a customer or supplier any former customer or supplier of AOS whose relationship with AOS ceased less than two (2) years before my date of termination of employment with AOS; (v) work in any capacity for any AOS competitor, customer or supplier within a one hundred fifty mile radius of any AOS office or other business location; or (vi) solicit, divert or take away any potential customer or supplier of AOS whose introduction to AOS occurred less than two (2) years before the date of my termination.

3

*Id.* at 2 (emphasis added). The Court refers to the underlined portion above as the Non-Compete Provision. This is the provision primarily at issue in this case.

When C1 acquired AOS, Hudson's job duties did not change. In July 2019, Hudson's position changed to Senior National Account Manager. Doc. 50-2 at 7. In that role, he still acted as an Account Manager but had additional duties including meeting with manufacturers and customers while trying to grow the market and secure C1's position. *Id.* Hudson held that role until September 2021, when he became a National Account Manager ("NAM"), which was effectively his prior role. *Id.* at 8-9. As a NAM, Hudson managed the accounts assigned to him and ensured his customers had their technology needs met. *Id.* at 10-11. This included having regular contact with his customers and preparing quotes. *Id.* at 11, 19. Hudson also had access to the Customer Relationship Management ("CRM") system at C1. *Id.* at 16-17. The CRM system included customer account information and agreements. *Id.* at 17-18.

Hudson had worked with Groves and Cussigh at AOS and C1. *Id.* at 24-25. In January 2022, Hudson and Cussigh began discussing Hudson coming to work at Logicalis. *Id.* at 26. Hudson was interested in leaving C1. *Id.* at 28. Hudson assumed he would be working in the same territory at Logicalis as he had with C1. *Id.* at 30.

Hudson applied to Logicalis in February 2022. *Id.* at 31. On his application, he disclosed that he had a non-compete agreement. *Id.*; *see also* Doc. 50-3 at 2. Hudson also assumed Cussigh knew about the non-compete agreement because of Cussigh's history at AOS and C1. Doc. 50-2 at 31.

Logicalis extended an offer to Hudson on February 22, 2022, for a position as an Account Executive. Doc. 50-17. The offer letter stated that, in accepting the offer, Hudson agreed to fully disclose all contractual agreements that could limit his employment with Logicalis and agreed to

indemnify Logicalis for any costs incurred if a prior employer sought to enforce such an agreement. *Id.* at 3.

Hudson resigned from C1 on February 24, 2022. Doc. 50-18. Upon his resignation, C1 sent Hudson a reminder letter about his post-employment obligations. Doc. 50-2 at 39. On March 11, 2022, C1 sent Hudson a cease-and-desist letter referencing the restrictive covenants and his new position with Logicalis. Doc. 50-21.

Hudson now works for Logicalis out of his home in Wichita. Doc. 50-2 at 33. His position is Account Executive, which he described as "basically the same thing as a NAM in the C-One world." *Id.* at 43. He described his territory with Logicalis as "very similar to ConvergeOne," including Oklahoma and Kansas. *Id.* at 34. He is currently doing training, but his duties are primarily soliciting customers for Logicalis. *Id.* at 43. Hudson reports to Smith. *Id.* In his time at Logicalis, Hudson has been involved in organizing marketing events. *See id.* at 74. Some of Hudson's former C1 customers were in attendance. *Id.* at 76. Hudson didn't talk to them but others from Logicalis did. *Id.* at 76-77, 80-82.

Hudson's employment with Logicalis is subject to several restrictive covenants. Doc. 50-17 at 8-12. One covenant is a Covenant to Not Compete Unfairly, which states that Hudson "shall not, directly or indirectly, provide, supervise, or facilitate the provision of Competing Services to a Competing Business in the Prohibited Territory without the Company's advance written consent." *Id.* at 10. "Competing Services" are "the same or substantially similar services or job duties that Employee provided or performed during the last twelve months of his/her employment with Logicalis." *Id.* at 8. "Prohibited Territory" is "the geographic territory for which Employee was responsible for customer sales, support or service at any time during the last twelve months of Employee's employment with Logicalis." *Id.* at 9. Logicalis also defined competing businesses,

and it <u>specifically lists</u> C1 as an example of a competing business. *Id.* at 8, 12. Hudson agrees that Logicalis is a competitor of C1. Doc. 50-2 at 38.

When Hudson resigned from C1, he took a screenshot of his customer list from CRM and labeled it his Do Not Call list. Doc. 44-5 at 6. Hudson testified that routinely happened when someone left AOS or C1—they would not call on customers if they were that customer's assigned Account Manager. *Id.* After starting at Logicalis, on April 18, 2022, Smith emailed Hudson, Smalley, and Rains, stating, "You should bring a list of accounts tomorrow that you are going to try to penetrate and have the information on there where [Cussigh] and I will need to help. I would say your top 20-30 prospects." Doc. 50-23. Hudson responded to all and attached his Do Not Call list and stated, "Just a reminder that the attached are accounts that I cannot call into." *Id.* Hudson testified that he wanted to let Cussigh and Smith know the accounts he was not allowed to talk to. Doc. 50-2 at 59. Logicalis ultimately did solicit some customers on Hudson's list. *Id.* at 60-61.

### C.    Lucas Smith

Smith started working at AOS in 2010. Doc. 50-4 at 4. His position was Design Architect. *Id.* In February 2017, he became a Sales Director. *Id.* at 5. As a Sales Director, Smith managed account managers, reported commitments of sales, and handled escalations with customers. *Id.* at 6. He had access to C1's CRM system. *Id.* at 12. He occasionally had interactions with customers. *Id.* at 16-19. Smith subsequently took on extra duties for state, local, and education ("SLED") customers over a 15-state territory for a time but did not receive the additional compensation he anticipated. *Id.* at 11, 21-24. So in 2021, he became a Senior Director of Services. *Id.* at 24. In that role, he managed delivery issues and was not involved in sales. *Id.* at 25. His interaction with customers was more limited. *Id.* at 25-26. As part of his employment with AOS, Smith signed a

Non-Competition and Non-Solicitation Agreement. Doc. 50-9. Smith's agreement was functionally identical to Hudson's, including the Non-Compete Provision. *See id.* at 2.

Smith had known Cussigh through previous work, including when they worked together at AOS and C1. Doc. 50-4 at 19. Smith reached out to Cussigh while he was at SKC in March 2021 and expressed interest in leaving C1. Doc. 44-3 at 5. Cussigh could not offer Smith a position at the time, but Cussigh later reached out in January or February 2022 to see if Smith was still interested in leaving C1. *Id.* Cussigh told Smith he was trying to build up a team at Logicalis "to build the region out," and asked Smith if he was interested. Doc. 50-4 at 20. When Cussigh approached Smith, Smith disclosed his non-competition agreement, and he knew that Cussigh was familiar with it because Cussigh had the same agreement when he was at AOS/C1. *Id.* at 26-27.

Smith applied to Logicalis in February 2022. *See* Doc. 50-5. On his application, he disclosed that he had a non-compete agreement. *Id.* at 2. Logicalis extended an offer to Smith on February 23, 2022, for a position as Director Area Sales. Doc. 50-16. Smith understood he would be working in the Kansas City area, and in Kansas. Doc. 50-4 at 21. The offer letter stated that, in accepting any offer, Smith agreed to fully disclose all contractual agreements that could limit his employment with Logicalis and agreed to indemnify Logicalis for any costs incurred if a prior employer sought to enforce such an agreement. Doc. 50-16 at 3. At some point, Smith provided a copy of the C1 agreement to Logicalis. Doc. 50-4 at 27.

Smith resigned from C1 effective March 3, 2022. Doc. 39 at 11; Doc. 50-4 at 31-32. As with Hudson, C1 sent Smith a reminder letter about his post-employment obligations. Doc. 50-19. On March 28, 2022, C1 sent Smith a cease-and-desist letter referencing the restrictive covenants and his new position with Logicalis. Doc. 50-20.

Smith currently works for Logicalis from his home office in Greenwood, Missouri. Doc. 50-4 at 30. His title is Director of Area Sales for Missouri. *Id.* But he focuses on commercial accounts in Kansas City, Wichita, and Topeka. Doc. 44-3 at 8. He does not deal with SLED accounts for Logicalis. *Id.*; *see also* Doc. 50-4 at 31. His primary duties at Logicalis are keeping Logicalis's CRM program up to date. Doc. 50-4 at 36. Smith testified that "[a] lot of the tasks are repetitive to what I did before . . . ." *Id.* at 36-37. But the new team at Logicalis has not made any sales yet to forecast. *Id.* at 37. He also oversees training for his team and meets with manufacturers to discuss partnerships. *Id.* at 37-38. His direct reports are Hudson, Smalley, and Rains. *Id.* at 38. Smith is sometimes involved in customer meetings. *Id.* at 40. Although the team has not made any sales yet, they are working with manufacturers to develop a customer base. Doc. 44-3 at 12. Some of Smith's C1 clients have been solicited by Logicalis, but not by Smith. *Id.* at 14. He has also talked to certain customer contacts on unrelated issues and told them he could not talk to them about business because of his non-compete agreements. *Id.* at 16.

Smith's employment with Logicalis is subject to the same restrictive covenants as Hudson, which are detailed above. Doc. 50-16 at 8-12; *see also* Doc. 44-3 at 11.

### D.    Mark Smalley

Smalley went to work at AOS in 1995. During his last two years of employment with C1, Smalley's job title was Solutions Architect. Doc. 50-6 at 5. In that role, he provided support to account managers by taking technical requirements from a customer, understanding the project goal, and putting the necessary items together, including writing the Statement of Work ("SOW"), which laid out the needs for the project. *Id.* at 5-6. The SOW would include pricing and margin for the project, which was generated from a C1 tool called OneQuote. *Id.* at 6-7. Smalley had some interaction with customers, but not as much as account managers. *Id.* at 8-9. His work covered

network and collaboration, while other people handled other issues like servers and security. *Id.* at 9. He had access to C1's CRM system. Doc. 44-6 at 5.

Smalley's employment with AOS and C1 was covered by a non-competition provision. Doc. 50-11. Smalley agreed:

> that for a period of one year from the date of termination of employment with the Company . . . the Employee will not, within the eastern half of the State of Kansas and within a One Hundred and Fifty mile radius of Kansas City and Wichita, directly or indirectly <u>engage in any business engaged in by the Company during the time of Employee's term of employment with the Company, or in any business competitive with such business</u>.

*Id.* at 3; *see also* Doc. 44-6 at 3. Although this language is different from that in the Hudson and Smith contracts, both provisions effectively bar Hudson, Smith, or Smalley from going to work for a competitor. Thus, the Court includes the language of Smalley's agreement when it refers to the Non-Compete Provision.

In February 2022, Cussigh called Smalley and asked if Smalley wanted to consider employment at Logicalis. Doc. 50-6 at 12-13. Smalley was not happy at C1 and was interested in leaving. *Id.* at 13. Cussigh said Logicalis was trying to build a new sales team in the area. *Id.* Smalley said he was interested in working as an Account Executive, which was different than his role at C1. *Id.*

Smalley applied to Logicalis in February 2022. *See* Doc. 50-7. Smalley disclosed that he had a non-compete agreement. *Id.* at 2. Smalley doesn't recall if he gave a copy of the agreement to Cussigh, but Smalley assumes he did because he knew it existed and he thought Cussigh had a similar one with C1. Doc. 50-6 at 16-17; Doc. 44-6 at 9.

Logicalis extended an offer to Smalley on March 2, 2022, for a position as an Account Executive. Doc. 50-13. The offer letter stated that, in accepting any offer, Smalley agreed to fully

disclose all contractual agreements that could limit his employment with Logicalis and agreed to indemnify Logicalis for any costs incurred if a prior employer sought to enforce such an agreement. *Id.* at 4.

Smalley resigned from C1 on March 14, 2022. Doc. 39 at 11; Doc. 50-6 at 17-18. As with Hudson and Smith, C1 sent Smalley a reminder letter about his post-employment obligations. Doc. 50-19; Doc. 44-6 at 12. C1 also sent Smalley a cease-and-desist letter referencing the restrictive covenants and his new position with Logicalis. Doc. 50-22; *see also* Doc. 50-6 at 22.

When asked by someone at C1 if he was going to work for a competitor, Smalley said that Logicalis could be considered a competitor. Doc. 44-6 at 12. But there was no doubt in Smalley's mind that he was going to work for a competitor of C1. *Id.* Smalley testified he thought going to work for Logicalis might be a problem in this regard, but he didn't want to work for C1 anymore. Doc. 50-6 at 19-20. He also testified that he had previously asked AOS for permission to go work for another company because AOS was very litigious. *Id.* at 21. But Smalley doesn't know why he didn't ask C1 about leaving to go work for Logicalis. *Id.*

Smalley's role with Logicalis is a hybrid role in that he works as Account Executive and Solutions Architect. *Id.* at 28. His job is to support customers and find solutions. Doc. 44-6 at 13. Like Hudson and Smith, Smalley's job at Logicalis is covered by restrictive covenants. Doc. 50-13 at 9-14. Smalley has had contact with customers on behalf of Logicalis that were C1 customers, though not customers he worked with while at C1. Doc. 44-6 at 14-16.

Smalley testified that Cussigh would not ask if a potential customer was a C1 customer. *Id.* at 17. It would be up to Smalley to speak up and say he can't work with that customer. *Id.*

E.      **Litigation**

C1 asserts claims against Hudson, Smith, Smalley, Heinen, and Logicalis. C1 sues each of the individual defendants for breach of contract. Doc. 53 at 17-21. C1 asserts a claim for tortious interference with contract against Logicalis. *Id.* at 21-22. And C1 finally asserts claims for unfair competition, unjust enrichment, and civil conspiracy against all Defendants, though these claims are not at issue in the preliminary-injunction motion. *Id.* at 22-24.

## II.     STANDARD

A party seeking a preliminary injunction must show that there is a substantial likelihood of success on the merits of the underlying claim, irreparable harm will occur unless the injunction is issued, the threatened injury outweighs any potential harm that the injunction may cause to the opposing party, and the injunction, if issued, will not adversely affect the public interest. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017). A preliminary injunction is "an extraordinary remedy." *Id.* at 1245-46 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Whether to issue an injunction is within the discretion of the court. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

## III.    ANALYSIS

A.      **Likelihood of Success on the Merits**

C1 seeks an injunction only as to its breach-of-contract claims against Hudson, Smith, and Smalley, and its tortious-interference claim against Logicalis. The Court therefore considers C1's likelihood of success on these the claims.

### 1.      Enforceability of Non-Compete Provision[3]

Defendants primarily argue that C1 is unlikely to succeed on the breach-of-contract or tortious-interference claims because these claims all turn on the existence of an enforceable agreement, and the Non-Compete Provision is not enforceable as a matter of law. A non-competition agreement is generally enforceable in Kansas based on the freedom of contract. *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996). But they are strictly construed against the employer and the restraint must be "reasonable under the circumstances and not adverse to the public welfare." *Id.* The Kansas Supreme Court has identified four factors to aid in evaluating whether a non-competition agreement is reasonable: (1) whether it protects a legitimate business interest of the employer; (2) whether the covenant creates an undue burden on the employee; (3) whether the time and territorial limitations are reasonable; and (4) whether the covenant is injurious to the public welfare. *Id.* at 90. Reasonableness ultimately turns on the specific circumstances of each case. *Id.* "If a noncompetition covenant is found to be more extensive than necessary to provide reasonable protection to the employer, courts have the power to reduce the territorial or time limitations to the extent reasonably necessary to insure the contemplated protection." *Am. Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1120 (D. Kan. 2000).

### a.      Legitimate Business Interest

C1 argues that the Non-Compete Provision serves legitimate business interests because Hudson, Smith, and Smalley were high-level and relatively long-term employees with direct customer contact and access to confidential information, including customer information, sales

---

[3]   C1 seeks to enforce the various restrictive covenants contained in Hudson's and Smith's contracts, including non-solicitation and confidentiality provisions. Defendants' arguments challenge the enforceability of the provisions generally. Because the other restrictive covenants are generally subsumed in the Non-Compete Provision, the Court focuses its analysis on the enforceability of that provision, which is applicable in substantially similar form as to Hudson, Smith, and Smalley.

strategies, and pricing. Doc. 39 at 23. Although preventing ordinary competition is not a legitimate business interest, "courts have pointed out that a protected interest exists where the employee obtains an unfair competitive advantage." *Weber*, 913 P.2d at 92. Accordingly, "Kansas Courts recognize that employers have an interest in . . . preventing unfair competition." *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1152 (D. Kan. 2007).

Customer contacts are also a long-recognized legitimate business interest that an employer can protect. *Weber*, 913 P.2d at 91; *see also Allen, Gibbs & Houlik, L.C. v. Ristow*, 94 P.3d 724, 726 (Kan. Ct. App. 2004) ("Prior Kansas cases have held that legally sufficient interests in the setting of an employment agreement include trade secrets and customer contacts or relationships."); *Am. Fid. Assurance Corp.*, 81 F. Supp. 2d at 1120 (noting that customer contacts are a legitimate business interest "where the employee's relationship with the employer's customers is such that there is a substantial risk that the employee may be able to divert all or part of the business"); *McConnell v. IMA Fin. Grp., Inc.*, 2021 WL 877000, at *9 (D. Kan. 2021) (noting that recognized legitimate business interests include "customer contacts, specialized training of employees, trade secrets, confidential business information, loss of clients, goodwill, reputation, referral sources, and preserving contacts with clients").

Defendants argue that the Non-Compete Provision does not serve a legitimate business interest because its effect is to isolate C1 from ordinary competition, which is not a legitimate business interest. Doc. 44 at 15-16. But this reasoning ignores that Hudson, Smith, and Smalley all had customer contacts, knew pricing and margins, and had access to sensitive and proprietary business information. Protecting customer and pricing information and goodwill are well-recognized legitimate interests, and the Court does not find that the Non-Compete Provision is only intended to prevent ordinary competition. *See McConnell*, 2021 WL 877000, at *9

("McConnell asserts, without authority or analysis, that IMA merely seeks to stifle ordinary competition . . . . However, the interests identified by IMA are well-recognized under Kansas law as legitimate and entitled to protection."). Notably, Logicalis has very similar restrictive covenants for its own employees. *See, e.g.*, Doc. 50-17 at 8-12. Logicalis's corporate representative testified that those restrictive covenants would be violated if a Logicalis employee went to go work for C1 in the Kansas City metro area. Doc. 50-12 at 10. Logicalis sees these restrictive covenants as necessary to protect its business. *See id.* ("Q. Okay. Why is it important to Logicalis that employees not be permitted to [go work for C1 in the Kansas City metro area] for at least a year after their employment ends?" A. To protect our business interests."). It is somewhat disingenuous for Logicalis to dispute the enforceability of such a restriction simply because the shoe is on the other foot.

Defendants also argue that the Non-Compete Provision is more broad than necessary to protect any legitimate business interest of C1. To the extent Defendants are challenging C1's interest in limiting Hudson, Smith, or Smalley from working for a competitor in <u>any</u> capacity, the Court agrees that the Non-Compete Provision would be overbroad if applied as written. To the extent the Non-Compete Provision is aimed at protecting customer contacts and avoiding <u>unfair</u> competition, the Court questions whether those interests would be served if Hudson, Smith, or Smalley were working for Logicalis in a capacity or covering a geographic territory wholly unrelated to their work at C1. At the hearing, both sides also seemed to acknowledge that Hudson, Smith, and Smalley could still work for Logicalis—but just not in the same or similar capacity that they worked for C1. The Court also notes that Logicalis's own non-compete provision seems to recognize that such a limitation is needed, as its own "Covenant to Not Compete Unfairly" limits an employee from engaging in the "same or substantially similar services or job duties" with a

competitor for one year after leaving Logicalis. *See, e.g.*, Doc. 50-17 at 8-10. Accordingly, to the extent the Court finds the Non-Compete Provision enforceable, it would only enforce it with this limitation. *See Am. Fid. Assurance Corp.*, 81 F. Supp. 2d at 1120. But, as discussed throughout, Hudson, Smith, and Smalley are engaging in essentially the same or substantially the same work in the same geographic territory for Logicalis that they did with C1.

> **b.    Undue Burden on Employee and Reasonableness of Time and Territorial Limits**

The second factor is whether the restriction places an undue burden on the employee. The third factor evaluates the reasonableness of any time and territorial restrictions. These considerations are often considered together because the burden on the employee often turns on the extent of the restrictions. *See McConnell*, 2021 WL 877000, at *10; *Digital Ally, Inc. v. Corum*, 2017 WL 1545671, at *10 (D. Kan. 2017).

Defendants generally challenge the 150-mile restriction. Doc. 44 at 16-18.[4] But the Court struggles to see the relevance of this argument under the facts of this case. "Kansas courts examine not whether the agreement protects legitimate business interests generally, but rather, whether the agreement protects legitimate business interests as applied . . . ." *Digital Ally*, 2017 WL 1545671, at *8. Here, Hudson, Smith, and Smalley are engaging in nearly the same work they did for C1 in

---

[4]    Defendants heavily rely on a Johnson County District Court opinion from 2014, *Alexander Open Systems, Inc. v. Johnson*, Case No. 13CV08184, which found the AOS agreement unenforceable. *See* Docs. 50-31, 50-32, 50-33. The portion of the record provided is brief and does not meaningfully develop the facts of that case, but it did involve a former AOS employee who had restrictive covenants similar, if not identical, to those of Hudson and Smith. *See* Doc. 50-31. AOS sought a preliminary injunction, and in the transcript of the hearing, the judge found that the 150-mile restriction was overbroad and seemed designed only to prevent the defendant "from existing inside that territory." Doc. 50-32 at 7. But there was no meaningful analysis on this issue. Nor is this ruling binding on the undersigned. Thus, the Court respectfully declines to follow that decision. Moreover, as stated throughout, the Court is tasked with evaluating the Non-Compete Provision under the particular facts and circumstances of this case. As explained above, the 150-mile limitation is largely irrelevant because it is undisputed that Hudson, Smith, and Smalley are all working in the exact same area that they worked for C1. Further, there is evidence in the record in this case that C1's restrictive covenants in fact do not necessarily prevent an employee from working in the 150-mile area, as Cussigh and Rains demonstrate.

the same locations that they worked for C1. To the extent Defendants challenge the 150-mile limitation, that is simply not at issue in this case where Defendants are threatening C1's legitimate business interests in its own backyard. Although Defendants argue 150 miles is too big, they offer no distance-based limitation that would be reasonable.[5]

At the hearing, Defendants' counsel suggested that there should be no geographic restriction because a restriction on contacting customers that Hudson, Smith, and Smalley had direct contact with at C1 would be sufficient. Tr. 10:15-25. The Court disagrees that this would be sufficient, particularly under the facts of this case. The evidence suggests that Hudson, Smith, and Smalley were at least attempting themselves to not contact the C1 customers they worked directly (or recently) with. But there was also evidence that the team put together by Logicalis, which consisted of five former C1 employees, three of whom were still under restrictive covenants, were collectively targeting C1 customers in the same geographic territories. Under these facts, C1 could not protect its customer base by simply restricting its former employees from their direct contacts when a call list can simply be passed to a coworker with the same inside knowledge about the territory and C1 (or where they can all stand together behind the new employer's table at a tradeshow). At least one Kansas court has rejected a similar attempt to limit a non-compete agreement based on promises of non-disclosure because it left the plaintiff to just hope the defendants would "not succumb to temptation and engage in illicit communication." *See Biomune Co. v. Vanderslice*, 2000 WL 36746490, at *6 (Kan. Ct. App. 2000). Where a contractual agreement is in place, a plaintiff "should not have to depend on the good will of its competitors."

---

[5]     Defendants don't challenge the one-year limitation. The Court finds this limit is reasonable under these facts. *Cf. Chem-Trol, Inc. v. Christensen*, 2009 WL 331625, at *10 (D. Kan. 2009) (noting that two-year non-compete agreements are generally reasonable in Kansas); *see also Am. Fidelity Assurance Corp.*, 81 F. Supp. 2d at 1120 ("The employer should be given a reasonable period of time to overcome the employee's personal hold over the customers.").

*See id.* Thus, although a court can reduce territorial limitations "to the extent reasonably necessary to insure the contemplated protection," *see Am. Fidelity Assurance Corp.*, 81 F. Supp. 2d at 1120, Defendants proposed compromise would not serve C1's legitimate business interests under these facts.

Nor is the Court persuaded by Defendants' argument that Hudson, Smith, or Smalley are unduly burdened by being forced "to seek work in another geographic area, hundreds of miles from their homes, to remain in the technology solutions industry, an industry they have worked in for years." Doc. 44 at 18. Both Cussigh and Rains were able to leave C1 and find work for different employers in the same area that did not violate their restrictive covenants. There is also evidence of another former C1 employee working in the industry without violating his covenants. This demonstrates that there are options available to Hudson, Smith, and Smalley that do not violate their agreements with C1. *Cf. Allen, Gibbs & Houlik, L.C.*, 94 P.3d at 729 (involving a covenant that left a plaintiff with "very few places" she could work).

### c.      Public Welfare

The fourth factor in evaluating the reasonableness of a restrictive covenant is whether it is injurious to the public interest or welfare. *Weber*, 913 P.2d at 93. The only public interests invoked by either party are the freedom to contract and preserving fair competition. On the first point, the Court does not find any reason to <u>not</u> enforce the Non-Compete Provision in this case. *See id.* at 96 ("Although restrictive provisions in contracts of employment must be reasonable and not such as to contravene the public welfare, the paramount public policy is that freedom to contract is not to be interfered with lightly."); *see also Servi-Tech, Inc. v. Olson*, 2017 WL 3839418, *5 (D. Kan. 2017) (noting a significant public interest in upholding contracts especially where the defendant signed and agreed to the restriction). The Kansas Supreme Court has directed that otherwise

enforceable contracts should be enforced when fairly entered "rather than to seek loopholes and technical legal grounds for defeating their intended legal purpose." *Universal Engraving*, 519 F. Supp. 2d at 1152 (quoting *Weber*, 913 P.2d at 89).

On the second point, the Court agrees there is a public interest in promoting fair competition. But the inverse of that is enforcing agreements that prevent <u>unfair</u> competition. *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, 2020 WL 1503475, at *10 (D. Kan. 2020). Here, Logicalis sought to build an "A Team" of individuals who could "hit the ground running" and who had "long-standing relationship[s] or long-standing tenure within a marketplace" and would be knowledgeable about the competition, partners, and prospective customers so that it could expand into the Kansas City metro and Kansas markets. Doc. 50-12 at 15-19. And part of that team are individuals who were bound by their C1 agreements to not do precisely what Logicalis would not want them to do if the situation were reversed. *See id.* at 10 ("Q. Okay. . . . if a Logicalis employee left Logicalis to go work for C-One in the Kansas City metro area, would that be considered providing services for – competing services to a competing business in the prohibited territory? A. The answer is yes."). Under these facts, the public interest and fair competition is served by enforcing the Non-Compete Provision.

Having considered the relevant factors, the Court finds that the Non-Compete Provision is enforceable under Kansas law, with the exception that it only prohibits Hudson, Smith, and Smalley from working for a competitor in the same or similar capacity as they worked for C1. Having determined the Non-Compete Provision is enforceable, the Court turns to whether C1 is likely to succeed on its breach-of-contract and tortious-interference claims.

## 2.      Likelihood of Success on Breach-of-Contract Claims

Under Kansas law, a breach-of-contract claim requires: "(1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff was damaged by the breach." *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 (D. Kan. 2006). Consideration and C1's performance are not at issue. As discussed above, the Court has found that the Non-Compete Provision is enforceable to the extent it limits Hudson, Smith, and Smalley from engaging in the same or substantially similar job duties for a competitor in the same geographic territory. Thus, C1's likelihood of success on the breach-of-contract claims turns on whether Hudson, Smith, and Smalley have breached the Non-Compete Provision and whether C1 has been damaged as a result.

Defendants argue that they have not breached any restrictive covenant to the extent Defendants believe they are enforceable. Doc. 44 at 20. But this ignores the plain language of the agreements, which, among other things, prohibits Hudson, Smith, and Smalley from working for C1 competitors. The Court understands Defendants' argument that the Non-Compete Provision is not enforceable. But the Court has rejected that argument, and there is no dispute that the Non-Compete Provision prohibits working for competitors, and Hudson, Smith, and Smalley have all left C1 to go work for its direct competitor, Logicalis. Nor is there any meaningful dispute that they are working in essentially the same positions and covering the same territory.

Hudson was an Account Manager for most of his time at AOS and C1. His new position for Logicalis, which he acknowledged is a C1 competitor, is "basically the same thing," and his territory with Logicalis is "very similar to ConvergeOne." Doc. 50-2 at 34, 38, 43. His current responsibilities include trying to find customers who might be interested in Logicalis's offerings.

Hudson also provided a list of his C1 customers to his team at Logicalis. Although the Court credits Hudson's apparent attempts to avoid calling on his C1 customers himself, some of the customers on the list circulated by Hudson have been solicited by Logicalis.

Smith held several roles at C1, including Sales Director, where he managed C1 account managers and helped them close deals. His new position with Logicalis is Director of Area Sales, and he manages a team of Logicalis account executives. He oversees his team's training and is working with manufacturers to discuss partnerships and develop customer accounts. His focus at Logicalis is commercial accounts, while he focused primarily on SLED customers at C1. However, some of his C1 clients have nevertheless been solicited by the Logicalis team that Smith supervises.

Smalley had a long tenure at AOS and C1, most recently serving as a Solutions Architect, which involved aiding customers by providing support to Account Managers and developing SOWs and pricing. Smalley's new role at Logicalis is a hybrid position of Account Executive and Solution Architect, and he has similar duties as he did at C1. He supports customers and helps them find solutions. Smalley knew that going to work for Logicalis in this role might be an issue, but he didn't want to work for C1 anymore. Since moving to Logicalis, Smalley has had contact with C1 customers.

The departure of Hudson, Smith, and Smalley has threatened C1's reputation and customers, as discussed further in the context of addressing irreparable harm. C1's corporate representative also testified that C1 has had to put in place a number of retention agreements and address salary and compensation issues to avoid further siphoning of C1's employees because of Hudson, Smith, and Smalley going to work at Logicalis.

Based on these facts, the Court finds that C1 is likely to succeed on its breach-of-contract claims against Hudson, Smith, and Smalley because they have violated the Non-Compete

Provision by going to work for Logicalis in similar or substantially similar roles, to the detriment of C1.

### 3.    Likelihood of Success on Tortious-Interference Claim

The next issue is whether C1 is likely to succeed on its tortious-interference claim against Logicalis. The elements of a tortious-interference claim are (1) a contract, (2) the defendant's knowledge thereof; (3) intentional procurement of its breach; (4) absence of justification; and (5) damages. *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008).

The record establishes that Logicalis was aware that Hudson, Smith, and Smalley all had restrictive covenants restricting them from coming to work for Logicalis, as all three disclosed it on their job applications to Logicalis. Cussigh's and Groves's history with C1 also made them aware of the Non-Compete Provision, and Logicalis's corporate representative specifically testified Logicalis was aware. *See* Doc. 50-12 at 36 ("Q. So is it fair to say that Logicalis was at least aware that these three individuals had Restrictive Covenant Agreements with C-One when they were hired?" A. Yes."). Despite this, Logicalis recruited and hired Hudson, Smith, and Smalley. There was no discussion about not hiring the three individuals in light of the Non-Compete Provision, and Logicalis instead moved forward with its plan to "penetrate" the area market "where we know of individuals that could build out a team" with the knowledge to "hit the ground running." *Id.* at 12, 37.

Based on this, the Court finds that C1 has demonstrated a likelihood of success on its tortious-interference claim against Logicalis.

### B.    Irreparable Harm

The second preliminary-injunction factor is whether irreparable harm will occur unless the injunction is issued. To justify an injunction, irreparable harm must be actual versus just

theoretical. *Universal Engraving*, 519 F. Supp. 2d at 1148. The loss must also be "certain and great," as opposed to "merely serious or substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004) (internal quotation and citation omitted). Economic loss is usually insufficient to constitute irreparable harm because those losses can be cured by money damages. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Nor will "wholly conclusory statements alone . . . constitute irreparable harm." *Universal Engraving*, 519 F. Supp. 2d at 1148.

C1 argues it will suffer irreparable harm without injunctive relief because it does not have an adequate remedy at law, it will lose goodwill and standing with its customers, and its remaining business in Overland Park, Topeka, and Wichita will be further threatened absent an injunction. Doc. 39 at 18-21. In support of these claims, C1's corporate representative testified that C1 is seeking an injunction to prevent the loss of goodwill and harm to C1's reputation. Doc. 50-30 at 3. He expressed concern that Hudson, Smith, and Smalley have significant confidential information about how C1 conducts business, cost modeling, cost margins, and how C1 approaches, attracts, and retains customers. *Id.* at 7-8. Allowing them to work for a competitor with that information creates an unfair advantage, whether or not the individuals specifically or affirmatively disclose it. *Id.* at 9. C1 also provided a declaration stating that Logicalis has been soliciting current C1 customers since Hudson, Smith, and Smalley left, including customers that Smith and Hudson specifically had relationships with. Doc. 50-15 at 4.

Defendants argue that any loss of customers is capable of monetary valuation, and future business losses are speculative. Doc. 44 at 22-23. The Court disagrees. "Unfair competition resulting from a breach of covenant not to compete is likely to constitute irreparable harm." *Universal Engraving*, 519 F. Supp. 2d at 1148. Likewise, loss of customers and goodwill is also

irreparable harm. *Id.* This is because "customer relationships . . . are not merely economic, and no amount of money can be assigned to the loss of these relationships." *Servi-Tech, Inc. v. Schmidt*, 2013 WL 12106876, at *2 (D. Kan. 2013); *see also Edelman Fin. Engines, LLC v. Harpsoe*, 2019 WL 329547, at *3 (D. Kan. 2019) ("And because defendants' actions will continue to affect the goodwill and relationships between plaintiff and its customers, monetary relief will not compensate plaintiff adequately for the harm it will sustain.").

The Court is mindful of Defendants' argument at the hearing that C1's representative acknowledged that no harm has yet occurred. Tr. 5:4-18. But there is also no requirement that irreparable harm actually occur before an injunction is warranted. *See Biomin Am.*, 2020 WL 1503475, at *10;[6] *see also Advisors Excel, LLC v. Zagula Kaye Consulting, LLC*, 2015 WL 736344, at *4 (D. Kan. 2015) ("Although none of plaintiff's producers has left plaintiff so far, the Court finds that defendants' recruitment efforts, if left unchecked, are likely to result in a loss of producers and harm to plaintiff's goodwill."). To the contrary, the purpose of an injunction is to stop an injury that could not otherwise be compensated with money damages. The type of harm C1 is concerned about is precisely that type of irreparable harm—loss of customers, goodwill, and the threat of unfair competition. The facts of this case suggest this concern is not just speculative or theoretical. As explained, Logicalis aimed to build a team that could build on past experiences and relationships to enter and quickly penetrate the Kansas City metro and Kansas markets. That team, which is entirely composed of former C1 employees, has solicited C1 customers in the short

---

[6]     Defendants relied on this Court's prior ruling in *Biomin* at the hearing. But *Biomin* was distinguishable from this case. In *Biomin*, which was decided on a much less developed record in late March 2020 due to the very recent onset of the pandemic, the plaintiff was unable to point to any evidence that customer relationships had been interfered with, relied heavily on "information and belief" allegations, and did not establish that the plaintiff and defendant were competitors. Here, it is undisputed that C1 and Logicalis are competitors, and Hudson, Smith, and Smalley are working in the same or very similar positions to target new customers for Logicalis, including at least some of C1's current customers. The Court finds these facts distinguishable from *Biomin*.

time it has been together. *See Advisors Excel*, 2015 WL 736344, at *4 ("Plaintiff asserts that defendants' efforts to recruit its producers make it look weak in its competitive marketplace. . . . While no 'snowball' has formed here, plaintiff has demonstrated that this threat is a real one, and not just a theoretical or speculative possibility."). Intentions of any particular individual aside, the Court does not find it credible that this does not pose irreparable harm to C1. This factor therefore weighs in favor of an injunction.

### C.    Balance of Harms

The third preliminary-injunction factor is whether the threatened injury outweighs the potential harm of the injunction to the opposing party. In evaluating whether the Non-Compete Provision is enforceable, the Court considered the burden imposed on Defendants, particularly Hudson, Smith, and Smalley. The Court is mindful and does not take lightly the impact of an injunction on these individuals. But it does not find that the balance of harms tips in favor of Defendants.

As discussed above, the Non-Compete Provision does not prevent Hudson, Smith, or Smalley from making a living in the industry, as demonstrated by Cussigh and Rains. *Cf. Allen, Gibbs & Houlik, L.C.*, 94 P.3d at 729 ("[I]f we choose to enforce this clause, Ristow could work virtually nowhere."); *Universal Engraving*, 519 F. Supp.2d at 1149 ("Dr. Duarte has presented this Court with no evidence that he has tried to obtain other employment."). The Court further notes that the injunction issued does not go as far as C1 proposes and leaves significant room for Hudson, Smith, and Smalley to support themselves. The limitation is also for a reasonable amount of time. By contrast, as explained above, C1 faces harm to its business that can't be quantified and is unlikely to be fully compensated absent an injunction. This factor weighs in favor of an injunction.

### D.      Public Interest

The fourth preliminary-injunction factor considers whether an injunction will adversely impact the public interest. This analysis largely mirrors the above analysis about whether the restrictive covenant is injurious to the public welfare. For the same reasons, the Court finds this factor weighs in favor of an injunction.

## IV.      CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Preliminary Injunction (Doc. 35) is GRANTED IN PART.

THE COURT FURTHER ORDERS that Defendants Hudson, Smith, and Smalley are enjoined from engaging in the same or substantially similar services or job duties for Logicalis that they performed during the last twelve months of their employment with C1 in the same geographic territory that they were responsible for at C1 for one year from their date of termination. Defendant Logicalis is enjoined from employing Hudson, Smith, and Smalley in the same or substantially similar services or job duties that they performed during the last twelve months of their employment with C1 in the same geographic territory that they were responsible for at C1 for one year from their date of termination.

THE COURT FURTHER ORDERS that the parties meet and confer regarding whether and what amount of bond should issue. Under Rule 65(c), a movant must provide security to pay for any party found to have been wrongfully enjoined. The Court is aware that at least two of the agreements (for Hudson and Smith) waive the bond requirement for any injunction issued. But the briefs otherwise do not address what bond amount, if any, is appropriate as to Smalley or Logicalis.

The parties shall therefore meet and confer on this issue by July 29, 2022. If they cannot reach a consensus, the parties should notify the Court, and the Court will set a briefing schedule.[7]

      IT IS SO ORDERED.

      <u>Dated: July 15, 2022</u>          <u>/s/ *Holly L. Teeter*         </u>
                                   HOLLY L. TEETER
                                   UNITED STATES DISTRICT JUDGE

---

[7] Heinen was not party to the preliminary-injunction motion. But at the hearing, counsel noted that the parties may be able to come to an agreement about Heinen depending on the ruling in this order. The Court reiterates that the parties are free to take whatever action regarding Heinen they deem appropriate, and this order does not apply to him. But to the extent the parties do reach an agreement, they should also consider any bond requirements for Heinen to the extent his agreement with C1 does not waive the issue.